UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NARINE POGOSYAN,<br><br>    Petitioner,<br><br> v.<br><br>PAMELA BONDI, et al.,<br><br>    Respondents. | Case No. 5:25-cv-03121-SRM-AS<br><br>**ORDER GRANTING, IN PART, MOTION FOR A TEMPORARY RESTRAINING ORDER [2]** |

## I. INTRODUCTION

  Before the Court is Petitioner Narine Pogosyan's ("Petitioner") Motion for a Temporary Restraining Order ("TRO Motion"). Dkt. 2. Respondents Attorney General Pamela Bondi, Secretary of the Department of Homeland Security Kristi Noem, the United States Department of Homeland Security, Warden F. Semaia, and Immigration and Customs Enforcement Field Office Director Jaime Rios ("Respondents") oppose the TRO Motion ("Opposition"). Dkt. 7. Petitioner filed a reply in support of the TRO Motion ("Reply"). Dkt. 9.

  The Court has reviewed the parties' arguments, relevant legal authority, and record in this case. The Court **GRANTS, IN PART**, the TRO Motion.

## II. BACKGROUND

Petitioner is a citizen of the former Soviet Union. Dkt. 1 at 2.[1] She was admitted into the United States as a parolee in 1992 and was granted permanent residency in the United States two years later. Dkt. 7-1 at 1. On August 26, 2008, an immigration judge ordered Petitioner removed from the United States to Armenia due to her theft conviction. *See* Dkt. 1 at 2; Dkt. 1-3. Petitioner was detained pending removal. Dkt. 1-1 at 2. According to Petitioner, Immigration and Customs Enforcement ("ICE") released her from custody and placed her on supervision on or about November 28, 2008. *Id.* As a condition of her release, Petitioner agreed not to "commit any crimes . . . while on this Order of Supervision." Dkt. 1-5 at 2. After she was released, in 2011, Petitioner applied for a "Certificate of Return to the Republic of Armenia." *See* Dkt. 1-1 at 2; Dkt. 1-6 at 1. On April 15, 2011, the Consulate General of the Republic of Armenia denied the application, explaining that "[t]he provided information was insufficient for the approval of her Armenian citizenship." Dkt. 1-6 at 1. While on release, Petitioner was convicted of multiple crimes, two of which were felonies from 2014 and 2019. Dkt. 7-1 at 3–4.

In early October 2025, ICE revoked Petitioner's release and re-detained her. *See* Dkt. 1-1 at 2; Dkt. 7-1 at 3. According to Petitioner, ICE detained her on October 5, 2025, during her regular check-in. Dkt. 1-1 at 2. Petitioner attests that the ICE officer did not tell her the reason for revoking her release, and that ICE did not give her any paperwork at the field office. *Id.* Two days later, Petitioner claims she was transferred to the Adelanto Detention Facility ("Adelanto"). *Id.* at 3. Upon her arrival, Petitioner states that no one explained to her why she had been detained. *Id.* She states under penalty of perjury:

> I have only been given three documents since I arrived. On or about October 7, 2025, I was given a Notice of Custody Review, informing me that there will be a custody review on December 18, 2025. On October 23, 2025, I was given a Notice of Failure

---

[1] Page citations refer to CM/ECF pagination.

to Comply. On November 14, 2025, I was given a Warning for Failure to Depart, which was dated on November 12, 2025.

*Id.* at 4. Petitioner further claims that since her detention on October 5th, "[n]o one at the field office or in Adelanto has asked [her] if [she] believe[s] there are any reasons [she] should not have been detained or that [she] cannot be deported to Armenia." *Id.*

Respondents, on the other hand, present a declaration submitted by Deportation Officer Jorge A. Suarez. ("Officer Suarez"). *See* Dkt. 7-1. Officer Suarez declares that it is part of his responsibilities as a deportation officer to review detained noncitizens' cases at the Los Angeles Field Office and Adelanto ICE Processing Center. *Id.* at 1. According to Officer Suarez, the Enforcement and Removal Operations ("ERO") encountered Petitioner during a scheduled interview on October 3, 2025. *Id.* at 3. During this interview, ERO served Petitioner with a "Warrant of Removal/Deportation," notifying her that the Department of Homeland Security intends to execute her final removal order and remove her to Armenia. *Id.*

On that same date—October 3, 2025—Officer Suarez states that Petitioner was served with a Notice of Revocation of Release ("Notice"). *Id.*; *see also id.* Ex. A. The Notice informs Petitioner that ICE has determined there were changed circumstances in her case that justify returning her to custody, and it revoked her release under 8 C.F.R. § 241.13. *See id.* Ex. A. Specifically, the Notice states the revocation was, in part, based on Petitioner's two prior felony convictions in 2014 and 2019. *Id.* The title of the official who decided to revoke Petitioner's release and re-detain her was a "S[upervisory] D[etention] D[eportation] O[fficer]." *See id.* at 7. According to the Proof of Service attached to the Notice, Deportation Officer C. Mondragon ("Officer Mondragon") served Petitioner with a copy of the Notice on October 3, 2025, at 1:00 p.m. at "ICE ERO/Los Angeles." *Id.* at 8.

Officer Suarez further declares that on October 3, 2025, ICE informally interviewed Petitioner and gave her the opportunity to respond to the reasons for revoking her release. *Id.* at 3–4. Officer Suarez attached to his declaration a document

-3-

titled "Alien Informal Interview Upon Revocation of Order of Supervision 8 C.F.R. § 241.4(l); 8 C.F.R. § 241.13(i)." *Id.* at 10. Officer Suarez claims this form reflects that an informal interview was conducted. *Id.* at 4. However, the Alien Informal Interview form does not recite what Petitioner stated and is not signed by Officer Mondragon. *See id.* at 10. The form memorializes that Petitioner was the person who made a statement, the A File #, the detention location, the interviewing officer, and the date the informal interview occurred. *See id.*

On November 19, 2025, Petitioner filed a "Verified Petition for Habeas Corpus and Complaint for Injunctive and Declaratory Relief." Dkt. 1. Despite the word "Verified" appearing in the title, the Petition is not verified by Petitioner or her attorneys. *See* Dkt. 1.[2] She names as respondents Pamela Bondi, the United States Attorney General; Kristi Noem, the Secretary of the Department of Homeland Security; the Department of Homeland Security; F. Semaia, the Warden of Adelanto; and Jaime Rios, the Acting Field Officer Director of ICE's Los Angeles office. *Id.* at 3–5.

Petitioner asserts three causes of action against Respondents. *See id.* at 10–12. The first cause of action asserts that Respondents did not properly revoke her release under 8 C.F.R. § 241.13(i)(2) ("Section 241.13") because there is no significant likelihood that her removal is reasonably foreseeable. *Id.* at 10. The second cause of action asserts that Respondents failed to comply with the revocation procedures under Section 241.13(i)(3). *Id.* Petitioner specifically alleges Respondents failed to provide her notice of the reasons for revoking her release, failed to provide her with an informal interview, and that the official that revoked her release did not have the proper authority to do so. *Id.* at 10–11. The third cause of action is a Fifth Amendment due process claim based on Respondents

---

[2] Local Rule 83-16.2 states that "[i]f the petition . . . is verified by a person other than the individual in custody, the person verifying the document shall set forth the reason why it has not been verified by the person in custody. The person verifying the document shall allege only facts personally known to that person. If facts are alleged upon information and belief, *the source of the information and belief shall be stated*." (emphasis added).

failure to give her an "individualized determination by impartial adjudicators as to whether detention is justified based on danger or flight risk." *Id.* at 10–11.

Petitioner now moves for a temporary restraining order, asking this Court to order Respondents to immediately release her on supervised release until ICE complies with the regulations governing the revocation of her release. Dkt. 2-1 at 12–13.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 65(b) governs temporary restraining orders. A temporary restraining order is an extraordinary remedy meant to preserve the status quo and to prevent irreparable harm "just so long as is necessary to hold a hearing and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

The standard for issuing a TRO and preliminary injunction is the same. *See Xuyue Zhang v. Barr*, 612 F. Supp. 3d 1005, 1012 (C.D. Cal. 2020) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). To obtain a TRO, the movant must establish "that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors merge when a TRO is sought against the government, as is true here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In cases where there may be a strong showing on the balance of hardships but a weaker showing on the likelihood of success, a movant may still obtain a TRO under the Ninth Circuit's sliding-scale approach. *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022). Under this sliding-scale approach, a movant may obtain a TRO if the movant can show (1) there are serious questions going to the merits, (2) there is a likelihood of irreparable injury, (3) the balance of hardships tips sharply towards the movant, (4) and the injunction is in the public's interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "'Serious questions' are

ones 'that "cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation."'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (quoting *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023)). "They 'need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits."'" *Id.* (quoting *Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). Even under this sliding-scale approach, a movant must still "make a showing on all four prongs." *Cottrell*, 632 F.3d at 1135.

The movant carries the burden of persuasion and must make a clear showing of entitlement to the requested relief. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Given the exigent nature of a TRO, a movant can rely on allegations in a verified complaint, exhibits, declarations, or affidavits, even if inadmissible under the Federal Rules of Evidence. *See Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) ("A verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief.") *overruled on other grounds by Board of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc); *Flynt*, 734 F.2d at 1394 ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."); *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) ("A verified complaint or supporting affidavits may afford the basis for a preliminary injunction."). Unverified allegations in the pleadings and unsupported and conclusory statements are not enough to prevail on a motion for a TRO. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (reversing district court's order granting preliminary injunction where it relied on unsupported and conclusory statements); *Greenberg v. Guzman*, No. CV 14-00866, 2014 WL 12569551, at *2 (C.D. Cal. July 28, 2014) ("A motion for preliminary injunction must be supported by '[e]vidence that goes beyond the unverified allegations of the pleadings.'") (quoting 9 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2949 (2011)).

## IV. DISCUSSION

Petitioner's first cause of action asserts that Respondents did not properly revoke her release under 8 C.F.R. § 241.13(i)(2) ("Section 241.13") because there is no significant likelihood that her removal is reasonably foreseeable. *Id.* at 10. The second cause of action asserts that Respondents failed to comply with the revocation procedures under Section 241.13(i)(3). *Id.* Petitioner specifically alleges Respondents failed to provide her notice of the reasons for revoking her release, failed to provide her with an informal interview, and that the official that revoked her release did not have the proper authority to do so. *Id.* at 10–11. The third cause of action is a Fifth Amendment due process claim based on Respondents' alleged failure to give her an "individualized determination by impartial adjudicators as to whether detention is justified based on danger or flight risk." *Id.* at 10–11.

### A. Likelihood of Success on the Merits

#### 1. First Cause of Action: Reasonable Foreseeability

The Immigration and Nationality Act details the procedures for removing a noncitizen from the United States. *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021). When a noncitizen has been ordered removed, ICE must remove the noncitizen from the United States within 90 days. 8 U.S.C. § 1231(a)(1)(A). The removal period begins when the latest of the following occurs: "(1) the date the order of removal becomes 'administratively final,' (2) the date of the final order of any court that entered a stay of removal, or (3) the date on which the alien is released from non-immigration detention or confinement." *Johnson*, 594 U.S. at 528 (citing 8 U.S.C. § 1231(a)(1)(B)(i)–(iii)). Detention is mandatory during the removal period. 8 U.S.C. § 1231(a)(2)(A); *see also* 8 C.F.R. § 241.3(a) ("Once the removal period defined in section 241(a)(1) of the Act begins, an alien in the United States will be taken into custody pursuant to the warrant of removal."). If the noncitizen is not removed within 90 days, she must be released subject to supervision governed by 8 C.F.R. §§ 241.4 or 241.13. *See id.* § 1231(a)(3).

It is not always possible, however, to effectuate removal within the first 90 days. *Zadvydas*, 533 U.S. 678, 701 (2001). Recognizing this practical reality, certain classes of noncitizens may be detained beyond the initial 90 days for a period reasonably necessary to secure the noncitizen's removal. *See* 8 U.S.C. § 1231(a)(6). In *Zadvydas v. Davis*, the Supreme Court explained that 8 U.S.C. § 1231(a)(6) does not permit indefinite detention. 533 U.S. at 699. But the Supreme Court did hold that, under 8 U.S.C. § 1231(a)(6), a noncitizen may be detained for a presumptively reasonable six-month period to effectuate removal. *Id.* at 701. The Supreme Court further explained that "[t]his 6-month presumption, of course, does not mean that every alien not removed must be released after six months." *Id.* The government may continue to detain a noncitizen, the Supreme Court stated, "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

After the Supreme Court's decision in *Zadvydas*, the Attorney General promulgated a set of implementing regulations "designed to narrow the scope of his authority to detain aliens beyond the post removal period in order to comply with the Supreme Court's decision." *Marquez Coromina v. Hollingsworth*, 692 F. Supp. 2d 565, 569–70 (D. Md. 2010); *see also Beckford v. Lynch*, 168 F. Supp. 3d 533, 538 (W.D.N.Y. 2016) ("To comply with the Supreme Court's ruling in *Zadvydas*, the Attorney General has promulgated regulations providing for review of the custody status of aliens who have been detained for more than six months after the issuance of a final order of removal."). Section 241.13 was among those regulations.

Section 241.13 establishes special review procedures in cases where a noncitizen has been detained beyond the removal period. *See* 8 C.F.R. § 241.13(a). Consistent with *Zadvydas*, Section 241.13 allows a noncitizen to request release if she can "provide[] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*; *see also id.* § 241.13(d)(1). Assuming a detained noncitizen can make this showing, the burden then shifts to ICE to present evidence to refute that assertion. *See id* § 241.13(e), (g); *see also Zadvydas*, 533 U.S. at 701 ("After this

6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."). If ICE determines that it cannot remove the noncitizen in the reasonably foreseeable future, and the presumptively reasonable six-month period has elapsed, it must release the noncitizen subject to certain conditions. *See* 8 U.S.C. § 1231(a)(6); 8 C.F.R. § 241.13(g)(1), (h)(1).

Under Section 241.13, ICE may revoke release and return a noncitizen to custody under two circumstances. *See* 8 C.F.R. § 241.13(i)(1)–(2). First, ICE may revoke release if the noncitizen "violates any of the conditions of release." *Id.* § 241.13(i)(1). Second, ICE may revoke release "if, on account of changes circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* § 241.13(i)(2).

Petitioner argues she is likely to succeed on this claim because there is no significant likelihood that she will be removed to Armenia in the reasonably foreseeable future as "she does not have Armenian citizenship." Dkt. 2-1 at 9. In so arguing, Petitioner relies on the fact that, in 2011, the Armenian consulate denied her application for "Certificate of Return to the Republic of Armenia," explaining that "[t]he provided information was insufficient for the approval of her Armenian citizenship." *See* Dkt 1-1 at 2; Dkt. 1-6 at 1.

This argument is unavailing. First, ICE revoked Petitioner's release under Section 241.13(i)(1) as the Notice states that her release was revoked based of her felony convictions from 2014 and 2019, which violated a condition of her release. *See* Dkt. 7-1 Ex. A. Notably, the language from the Notice does not suggest that ICE revoked her released under Section 241.13(i)(2) because it does not state that her release was revoked because there is no significant likelihood that her removal is reasonably foreseeable. *See id.* Second, even if ICE revoked her release under Section 241.13(i)(2), the letter from the Armenian consulate alone is not enough to make a clear showing that she is likely to succeed, or has a fair chance of success, on this cause of action. The letter from the

Armenian consulate is over 14 years old. Even if it were true that her removal was not reasonably foreseeable in 2011, Petitioner does not provide any recent evidence to show that the same is true today. At best, the 2011 letter suggests there may be *some* likelihood that her removal is not reasonably foreseeable, but it does not clearly show that there is no *significant* likelihood that her removal is not reasonably foreseeable.

Petitioner has thus failed to make a clear showing that she is likely to succeed, or has a fair chance of success, on her first cause of action.

        2.        Second Cause of Action: Notice, Informal Interview, and Authority to Revoke

Petitioner's second cause of action arises from Respondents' failure to comply with the procedures for revoking her release under Section 241.13(i)(3) in three separate ways. According to the Petition, Respondents failed to give her notice of the reason for revoking her release; Respondents failed to provide her with an informal interview; and the ICE official who revoked her release did not have the authority to do so. Dkt. 1 at 10–11. In the TRO Motion, Petitioner argues she is likely to succeed on this cause of action because Respondents did not give her sufficient notice or an informal interview. *See* Dkt. 2-1 at 8–9. In her Reply, Petitioner raises the argument that she is likely to succeed on this cause of action because the ICE official who revoked her release did not have the authority to do so. *See* Dkt. 9 at 3-4. Because that argument was raised for the first time in her Reply, the Court declines to consider it. *FT Travel—N.Y., LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1079 (C.D. Cal. 2015) ("Courts decline to consider arguments that are raised for the first time in reply.").

The procedures for revoking release under Section 241.13(i)(3) are as follows:

> Upon revocation, the alien will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in

> the reasonably foreseeable future, or that he or she has not violated the order of supervision. The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release.

8 C.F.R. § 241.13(i)(3).

Petitioner argues she is likely to succeed on this cause of action because ICE did not give her notice of the reasons for revoking her release. Dkt. 2-1 at 9. In her declaration, Petitioner attests to a qualified statement. She states that on, *October 5, 2025*, she "was not given any paperwork by the ICE officials at the field office," Dkt. 1-1 at 2, and that she has only been given three documents since she arrived at Adelanto on October 7, 2025: a Notice of Custody Review, a Notice of Failure to Comply, and a Warning for Failure to Depart, *id.* at 3. Respondents argue she is not likely to succeed on the merits because ICE gave her written notice of the reasons for revoking her release. Dkt. 7 at 18. In support of their argument, Respondents offer Officer Suarez's declaration and a copy of the Notice and Proof of Service. *See* Dkt. 7-1 at 1–10. According to that evidence, Officer Mondragon served Petitioner with the Notice of Revocation on *October 3, 2025*, at 1:00 p.m. at "ICE ERO/Los Angeles." *See id.* at 8. The Notice further informed Petitioner that ICE was revoking her release, in part, because of her 2014 and 2019 felony convictions, which violated a condition of her release. *Id.* at 7.

Petitioner has not made a clear showing that she is likely to succeed, or has a fair chance of success, on the cause of action based on a failure to provide notice. Although Petitioner claims she "was not given any paperwork by the ICE officials at the field office," on *October 5, 2025*, Dkt. 1-1 at 2, the Proof of Service shows that Officer Mondragon served the Notice on Petitioner on *October 3, 2025*, Dkt. 7-1 at 3, two days before October 5, 2025. It is notable that even after Respondents attached the Proof of Service to their Opposition, Petitioner did not offer any evidence in her Reply clarifying that she did not receive that notice on October 3, 2025. *See* Dkt. 9 at 5–8. She instead relies on her original declaration and argues that the Proof of Service is not signed by the

-11-

official who served it or by Petitioner. *See* Dkt. 9 at 5–6. But, as discussed, that original declaration is qualified by the date and does not state that she did not receive the Notice ever, or on October 3, 2025. Moreover, nothing in Section 241.13(i)(3) requires that a proof of service be signed by the serving official. For these reasons, Petitioner has not made a clear showing that she is likely to succeed, or has a fair chance of success, on the second cause of action based on Respondents' alleged failure to not provide her notice.

Petitioner also argues that ICE did not provide her an informal interview. Dkt. 2 at 9. She states in her declaration that "[w]hen I went to my check-in on October 5, 2025, the officer brought me into an office, cut off the bracelet, and detained me. She did not give me any reason for revoking my release, nor did she ask me if I thought there was any reason that I should not be detained. I was not given any paperwork by the ICE officials at the field office." Dkt. 2-2 at 1. In response, Respondents again rely on Officer Suarez's declaration. *See* Dkt. 7 at 18. Officer Suarez attests that Petitioner was given an informal interview, which was based on a form that purports to memorialize that interview on October 3, 2025. *See id.* Ex. B. That form, however, does not show whether Petitioner offered or did not offer to provide a written statement. *See id.* More importantly, the form is not signed by Officer Mondragon. *See id.* Based on the current record, Petitioner shows that she has a fair chance of success on the second cause of action based on Respondents' failure to provide an informal interview.

          3.      Third Cause of Action: Unlawful Detention Without Individualized Determinations of Danger or Flight Risk

Petitioner's third cause of action is titled, "Unlawful Detention Without Individualized Determinations of Danger or Flight Risk." Dkt. 1 at 11. Without citing any statute or regulation, Petitioner alleges she "is entitled to an individualized determination by impartial adjudicators as to whether detention is justified based on danger or flight risk." Dkt. 1 at 12. In the TRO Motion, Petitioner provides some clarity. She states that "[t]he regulations permit release of a non-citizen subject to a removal order after the 90-day removal period has elapsed if ICE determines that the non-citizen 'would not pose

a danger to the public or a risk of flight, without regard to the likelihood of the [non-citizen's] removal in the reasonably foreseeable future.'" Dkt. 2-1 at 5–6 (quoting 8 C.F.R. § 241.13(b)(1)). Petitioner fails to offer any argument or evidence to show that Respondents failed to comply with this alleged regulatory obligation. *Id.* at 5–10. Indeed, Petitioner focuses the entirety of her likelihood-of-success arguments on the first and second causes of action. *See id.*

For these reasons, Petitioner has not made a clear showing that she is likely to succeed, or has a fair chance of success, on her third cause of action.

### B. Irreparable Harm

Petitioner argues she is likely to suffer irreparable harm absent the issuance of a temporary restraining order. Dkt. 2-1 at 11–13. Among her arguments, Petitioner contends she would suffer irreparable harm because she would be subject to "continued unlawful detention[.]" *Id.* Respondents did not respond to this argument in their Opposition. *See* Dkt. 7.

"[U]nlawful detention certainly constitutes extreme or very serious damage, and that is not compensable in damages." *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (internal quotations marks omitted). In fact, a detained noncitizen "suffers potentially irreparable harm every day that [s]he remains in custody without a hearing, which could ultimately result in h[er] release from detention." *Nazarian v. Noem*, No. EDCV 25-02694, 2025 WL 3236209, at *6 (C.D. Cal. Nov. 3, 2025) (quoting *Cortez v. Sessions*, 318 F. Supp. 3d 1134, 1139 (N.D. Cal. 2018)).

Here, the evidence shows that Respondents have not complied with the Section 241.13(i)(3)'s revocation procedures by failing to provide Petitioner with an informal interview. Petitioner continues to suffer irreparable harm while she remains in custody without an informal interview, which, if given, could result in her release from detention. Accordingly, the Court concludes that Petitioner has shown that she will suffer irreparable harm if she continues to be detained without an informal interview.

### C. Balance of Equities and Public Interest

The last two factors—balance of equities and public interest—also weigh in favor of granting, in part, the TRO Motion. With regard to the balance of the equities, Petitioner faces a continuing harm if she is unable to respond to the reasons for the revocation of her release. Respondents, by contrast, will suffer minimal injury if they are required to provide her with an informal interview forthwith, especially considering Petitioner is already in Respondents' custody. Moreover, "[t]he public has a strong interest in upholding procedural protections against unlawful detention, and the Ninth Circuit has recognized that the costs to the public of immigration detention are staggering." *Diaz v. Kaiser*, No. 3:25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (quoting *Jorge M.F. v. Wilkinson*, No, 21-cv-01434, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021)).

\*   \*   \*

After balancing the four *Winter* factors above, the Court concludes that they weigh in favor of granting, in part, the TRO Motion.

### D. Scope of Relief

Petitioner argues the appropriate relief is to place her back in the position that preceded this Petition—that is, to place her back on release under the same terms and conditions that preceded the revocation of her release. Dkt. 2-1 at 13.

A temporary restraining order is meant to preserve the status quo and to prevent irreparable harm before a hearing can be held on a preliminary injunction. *Granny Goose*, 415 U.S. at 429. For purposes of a temporary restraining order, "[t]he status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)). Moreover, the Ninth Circuit has "long held that injunctive relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015).

Based on this record, it is uncontested that Respondents gave Petitioner written notice of the reasons for revoking her release when they revoked her release and re-detained her. *See* discussion *supra* Section IV.A.2. Moreover, the only pending controversy at issue is whether Respondents provided Petitioner with an informal interview *after* they revoked her release and re-detained her. Thus, Petitioner's last uncontested status was not when she was on release but when she was detained after ICE served her with the Notice, revoked her release, and re-detained her. Additionally, the specific harm at issue is whether Petitioner is being deprived of the prompt opportunity to be heard on why she did not violate the conditions of her release by committing the two felonies in 2014 and 2019. Given these facts, requiring Respondents to give Petitioner an informal interview forthwith will preserve the status quo *ante litem* while ensuring that the relief is narrowly tailored to address the specific harms that remain in this TRO Motion.

### E. Bond

A court may issue a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court "with discretion as to the amount of security required, *if any*."'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). A district court "'may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm" to the nonmovant. *Id.* (quoting *Jorgensen*, 320 F.3d at 919). The nonmovant is not absolved of its "obligation of presenting evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).

Here, Respondents have not presented any evidence that would show a bond is necessary in this case. The Court thus exercises its discretion and waives the bond requirement.

## V. CONCLUSION

Having weighed the four *Winter* factors, the Court concludes they weigh in favor of Petitioner. For the above reasons, the Motion for a Temporary Restraining Order is **GRANTED, IN PART.** The Court **ORDERS** as follows:

1. Respondents, their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Respondents are **ORDERED** to provide Petitioner with an informal interview by December 10, 2025, as required under 8 C.F.R. § 241.13(i)(3). Respondents are further **ORDERED** to submit a declaration from the ICE official who conducted the interview by December 12, 2025.

2. This order will remain in effect until December 17, 2025, at 5:00 p.m. This order may be extended for good cause or with Respondents' consent; and

3. Respondents are **ORDERED TO SHOW CAUSE** on December 8, 2025, why a preliminary injunction should not issue. *See* C.D. Cal. R. 65-1. Petitioner may supplement this TRO Motion no later than December 10, 2025, and Respondents must file any written response to the Order to Show Cause no later than December 12, 2025. Petitioner may file a reply no later than December 15, 2025. The Court will set a hearing only if necessary.

**IT IS SO ORDERED.**

Dated: December 3, 2025

HON. SERENA R. MURILLO
UNITED STATES DISTRICT JUDGE